**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**STEVEN RAYBURN**,

      Plaintiff,

  vs.                                            No. **05cv675 MCA/RHS**

**BRIDGESTONE FIRESTONE, a foreign
corporation,**

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Defendant's Motion to Compel Arbitration and Dismiss Plaintiff's Complaint or, in the Alternative, Stay the Proceedings* [Doc. 6], filed August 8, 2005. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants the *Motion* to compel arbitration. Rather than dismiss the *Complaint*, however, the Court will stay the proceedings in this matter.

## I. BACKGROUND

Plaintiff Steven Rayburn ("Rayburn") is an African-American former employee of Defendant BFS Retail and Commercial Operations, LLC ("BFRC").[1] Rayburn worked for BFRC as a mechanic at its Rio Rancho, New Mexico location from March 2000 until his termination in 2004. According to his *Complaint*, Rayburn was the only African-American

---

[1] Rayburn refers to BFRC as both "Bridgestone" and "Bridgestone Firestone." [See generally Docs. 1, 10].

employee at the Rio Rancho location. [Doc. 1 at 1-2].

Rayburn alleges that in late 2002, some of his co-workers began directing racial slurs and comments toward him. When Rayburn asked these individuals to refrain from making such remarks and reported their behavior to his supervisors, the discriminatory conduct continued and, he contends, intensified. Rayburn reported his co-workers a second time but still supervisors took no action. Rayburn maintains that after reporting his co-workers' actions, he began to notice that other mechanics were given better-paying assignments than he received. [Doc. 1 at 2-3].

In the summer of 2003, Rayburn sustained an on-the-job injury as a result of working with defective equipment. He filed a workers' compensation claim and also reported the defective equipment to his supervisors, who took no action. Rayburn then called the New Mexico Department of Occupational Health and Safety ("NMOHS"), which came to the workplace for an inspection. Following its visit, NMOHS instructed BFRC to replace the defective equipment. [Doc. 1 at 3]. There apparently was suspicion around the workplace that Rayburn had reported his co-workers to NMOHS. [See id. at ¶ 25, "After the visit from NMOSHA, Plaintiff's supervisor told Plaintiff's co-workers that they suspected Plaintiff had reported them."]. In any event, Rayburn was terminated on January 20, 2004. According to Rayburn, he was terminated because he failed to repair a customer's vehicle. [Id. at 3]. According to BFRC, Rayburn was terminated because he defrauded a customer. [Doc. 7 at 1]. On June 16, 2005, Rayburn filed his *Complaint for Employment Discrimination on the Basis of Race, and Retaliatory Discharge*, alleging violations of Title VII and New Mexico

law.  [See generally Doc. 1].

On August 8, 2005, BFRC filed *Defendant's Motion to Compel Arbitration and Dismiss Plaintiff's Complaint or, in the Alternative, Stay the Proceedings*.  [See Doc. 6]. BFRC alleges that Rayburn's employment was conditioned on his agreement to be bound by the terms of BFRC's binding arbitration program, which is contained in its Employee Dispute Resolution Plan ("EDR Plan"), and that, after being offered and accepting employment, Rayburn again acknowledged his agreement to be bound by the EDR Plan. [Doc. 7 at 3-5].  BFRC also argues that this agreement to arbitrate is valid and enforceable under the Federal Arbitration Act ("FAA") and that the parties have agreed to arbitrate the specific issues raised by Rayburn's *Complaint*.  [See id. at 5-14].  For these reasons, BFRC urges this Court to compel arbitration and dismiss the *Complaint* or, alternatively, stay the proceedings pending arbitration.  [Id. at 15-16].

In response, Rayburn asserts that the agreement to arbitrate as included in BFRC's 1995 EDR Plan, which was in effect when Rayburn was hired and was amended in 2003, is unenforceable because it allows BFRC to make unilateral changes.  Rayburn asserts that the agreement as amended in 2003 also is unenforceable because it too allows BFRC to make unilateral changes and because there was no consideration.  [See Doc. 10 at 4-5].  Rayburn additionally challenges the validity of the 2003 agreement on grounds that it (1) does not require the signature of any BFRC corporate officer and, therefore, does not bind BFRC; (2) requires employees to pay a $100 fee to initiate arbitration; (3) does not specify whether it applied to disputes following an employee's termination; and (4) allows employees only

3

90 days to initiate the arbitration process.  [Id. at 6-7].

## II. ANALYSIS

### A. Enforceability of the Arbitration Agreement

Section 2 of Title 9 of the United States Code provides that

> [a] written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.  When parties agree to arbitrate a dispute, they trade courtroom procedures and opportunities for review for the simplicity, informality, and expediency of arbitration.  U.S. Energy Corp. v. Nukem, Inc., 400 F.3d 822, 829 (10th Cir. 2005).  Indeed, a primary purpose of an arbitration agreement is to avoid the expense and delay of Court proceedings.  Id.  Thus, when a contract contains an arbitration clause, there is a presumption in favor of arbitrability.  Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25, (1983); Local 5-857 Paper, Allied-Industrial, Chemical and Energy Workers Intern. Union v. Conoco, Inc., 320 F.3d 1123, 1126 (10th Cir. 2003).  Where, however, the parties dispute whether there is a valid and enforceable arbitration agreement in the first place, the presumption of arbitrability falls away and it becomes the initial task of the Court to decide as a threshold issue whether such an arbitration agreement exists.  See Riley Mfg. Co., Inc. v. Anchor Glass Container Corp., 157 F.3d 775, 779 (10th Cir. 1998).

In the instant case, the Court is not persuaded that the arbitration agreement as set forth in the 1995 EDR Plan and amended in 2003 is unenforceable.  First, to the extent that Rayburn contends that the 1995 EDR Plan gives BFRC the unfettered right to alter its terms, such a contention is contradicted by the record evidence.  It is true that, in the Tenth Circuit, "an arbitration agreement allowing one party the unfettered right to alter the arbitration agreement's existence or its scope is illusory."  Dumais v. American Golf Corp., 299 F.3d 1216, 1219 (10th Cir. 2002).  But that is not the situation here.  In Dumais, Defendant American Golf's employee handbook gave American Golf unilateral power to "alter, modify, change, etc., any provision of the Handbook except Appellee's employment-at-will status."  Id. at 1218.  Citing its inconsistency with another handbook provision, the Tenth Circuit interpreted the quoted language as allowing American Golf to change the challenged arbitration provision at will.  Id. at 1219.

By contrast, in the instant case, limitations exist on BFRC's right to modify or amend the provisions of the EDR Plan.  For example, no amendment would apply to a dispute of which BFRC had actual notice on the date of amendment.  The EDR Plan also dictates that for an amendment to become effective, notice of the amendment must be sent to both the affected employee and the American Arbitration Association.  Finally, while BFRC may terminate the EDR Plan, termination does not become effective until 60 days after notice of the termination is provided to employees.  Furthermore, an amendment is not effective as to any dispute arising before the date of the termination.  [Doc. 7; Exh. 3, "Bridgestone/Firestone, Inc. Employee Dispute Resolution Plan," Oct. 1, 1995, at 10].

5

Indeed, rather than parallel Dumais, the relevant facts here more closely track those set forth in Pierce v. Kellogg, Brown & Root, Inc., wherein the District Court for the Eastern District of Oklahoma rejected the plaintiff/employee's "illusory agreement" argument in the face of evidence that any amendment to the defendant/employer's Dispute Resolution Program ("DRP") (1) required at least 10 days' notice to current employees, and (2) would not derail existing arbitration proceedings. Moreover, a provision in the DRP itself stated that neither an amendment to the DRP nor its termination would be effective as to disputes for which a proceeding had been initiated as of the date of the proposed amendment or termination. Pierce v. Kellogg, Brown & Root, Inc., 245 F.Supp.2d 1212, 1215 (E.D.Okla. 2003). This Court is persuaded by the reasoning in Pierce and accordingly concludes that the 1995 EDR Plan as amended in 2003 is not rendered illusory by any unfettered right of BFRC to modify or alter its terms.

Rayburn next argues that he received no consideration in exchange for relinquishing his right to sue to resolve disputes with BFRC. [See Doc. 10 at 5 ("[T]he Agreement . . . does not state the employee will receive any compensation for giving up his right to address grievances through the judicial system.")]. "'Consideration consists of a promise to do something that a party is under no legal obligation to do or to forbear from doing something he has a legal right to do.'" Piano v. Premier Distrib. Co., 107 P.3d 11, 14 (N.M. Ct. App. 2004) (*quoting* Heye v. American Golf Corp., Inc., 80 P.3d 495, 499 (N.M. Ct. App. 2003)). To be valid, an agreement must possess mutuality of obligation, meaning that both sides must provide consideration. Heye, 80 P.2d at 499 (*quoting* Bd. of Educ. v. James Hamilton

6

Constr. Co., 891 P.2d 556, 561 (N.M. Ct. App.1994).  In this case, both Rayburn and BFRC—not just Rayburn—exchanged the right to pursue in-Court litigation for the expediency of arbitration.  The 1995 EDR Plan clearly states that "[a]pplication for employment, initial employment, or continued employment on or after the effective date of this Plan constitutes consent and agreement *by both the Employee and the Company to be bound by this Plan*."  [Doc. 7, Exh. 3 (emphasis added)].  As amended in 2003, the EDR Plan similarly provides that

> [a]pplication for employment, initial employment, continued employment, or acceptance of any promotions, pay increases, bonuses, or any other benefits of employment on or after the effective date of the BFS Retail & Commercial Operations, LLC Employee Dispute Resolution Plan constitutes consent and agreement *by both the Employee and the Company to be bound by the following terms*.

[Doc. 7, Exh. 4, "A July 1, 2003 Amendment to the Bridgestone/Firestone, Inc. Employee Dispute Resolution Plan October 1, 1995" at 1 (emphasis added)].  Accordingly, the Court concludes that both Rayburn and BFRC gave consideration for the agreement to arbitrate.

Rayburn also argues that the EDR Plan as amended is unenforceable because no corporate officer of BFRC was required to sign the agreement.  For that reason, Rayburn asserts that BFRC is not bound by the terms of the agreement.  [Doc. 10 at 6].  That a representative of BFRC did not sign the arbitration agreement does not mean that the agreement is not binding on BFRC.  In New Mexico, "[f]or a contract to be legally valid and enforceable, it must be factually supported by an offer, an acceptance, consideration, and mutual assent."  Heye, 80 P.3d at 498.  Also, as explained above, the plain language of the

7

EDR Plan makes clear that BFRC was indeed bound by its terms. Thus, the Court rejects Rayburn's argument on this point.

Rayburn next argues that the EDR Plan is unenforceable because its terms require that an employee seeking to initiate arbitration to pay a $100 fee. [Doc. 10 at 6]. Rayburn cites Shankle v. B-G Maint. Mgmt. of Colorado, Inc. in support of his position. In Shankle, the Tenth Circuit held unenforceable an arbitration agreement that would have required an employee to pay one-half of the arbitrator's fees. The employee in that case was a janitor whose share of the arbitrator's fees was expected to total between $1,875 and $5,000. Shankle v. B-G Maint. Mgmt. of Colorado, Inc., 163 F.3d 1230, 1234 (10th Cir. 1999). Because the terms of the arbitration agreement prevented the employee from litigating his claims, and because cost prohibitions effectively prevented him from arbitrating those claims, the employee in Shankle was left with no accessible forum in which he could attempt to vindicate his statutory rights. Holding the arbitration agreement unenforceable, the Tenth Circuit emphasized that "an arbitration agreement that prohibits use of the judicial forum as a means of resolving statutory claims must also provide for an effective and accessible alternative forum." Shankle, 163 F.3d at 1234.

Rayburn's situation differs from that of the employee in Shankle because Rayburn is required to pay only a $100 administrative fee in order to initiate arbitration. [See Doc. 7, Exh. 4 at 15]. Additionally, the terms of the EDR Plan specifically state that, even where the employee, as opposed to BFRC, initiates arbitration, BFRC will nevertheless "be responsible for any other AAA administrative fees and expenses of the mediator and/or

8

arbitrator." [Id.]  Thus, as BFRC notes, it is more economical for Rayburn to arbitrate his claims and pay the $100 administrative fee, which is less than half the cost of initiating a lawsuit in federal Court.  See http://www.nmcourt.fed.us/web/DCDOCS/files/usdcfaqs.html (explaining that the fee for filing a civil action in the United States District Court for the District of New Mexico is $250.00).

Finally, Rayburn argues that the arbitration agreement is unenforceable because it (1) does not specify whether it applies to post-termination disputes; and (2) affords him only 90 days in which to initiate arbitration, which is contrary to the longer statutes of limitations provided under state and federal law.  [Doc. 10 at 6-7].  The Court concludes that both of these arguments are unsupported by the record evidence.  With respect to Rayburn's first contention, the EDR Plan clearly states that it "is intended to create an exclusive mechanism for the final resolution of all disputes falling within its terms."  [See Doc. 7, Exh. 4 at 1]. The Plan goes on to define "dispute" as, among other things, "a legal claim between persons bound by the EDR Plan which relates to, arises from, concerns, or involves in any way . . . . termination of  . . . employment . . . claims of discrimination on any basis, including race . . . [r]etaliation claims . . . [and c]laims relating to involuntary terminations . . . ."  [Id.]. Also, as amended in 2003, the EDR Plan includes the following information:

> What happens if I am terminated or laid off by the Company?
> Does the EDR Plan still apply to me?
>
> Answer: *Yes.  If you are terminated* or laid off, you must still resolve all disputes covered by the EDR Plan through the EDR Plan.  All options of the EDR Plan would be available to you.

9

[Doc. 11, Exh. 2, "A July 1, 2003 Amendment to the Bridgestone/Firestone, Inc. Employee Dispute Resolution Plan October 1, 1995" at viii (emphasis added)].

With respect to Rayburn's second contention, the EDR Plan states that an employee pursuing arbitration does so by first submitting a written request for mediation, which "must be filed within ninety (90) days of the event giving rise to the Dispute *or before the expiration of the applicable statute of limitations, whichever is longer*." [Doc. 11, Exh. 2, "A July 1, 2003 Amendment" at 5 (emphasis added)]. An employee must then initiate the actual arbitration proceeding within 30 days from the date on which the mediation process concludes. [Id. at 6]. Accordingly, Rayburn's argument that the EDR Plan "has [a] very short statute of limitations placed on the employee that is contrary to state and federal laws" is unconvincing. For the foregoing reasons, the Court rejects Rayburn's arguments challenging the arbitration agreement's enforceability.

### B. Scope of the Arbitration Agreement

Having satisfied itself of the existence of a valid and enforceable agreement to arbitrate, the Court's next task is to determine whether the parties agreed to arbitrate the claims at issue. Williams v. Imhoff, 203 F. 3d 758, 764 (10th Cir. 2000) (*quoting* Mitsubishi Motors Corp. v. Soler Chrysler- Plymouth, Inc., 473 U. S. 614, 626 (1985)). Should the Court determine the agreement covers Rayburn's claims, the second inquiry is whether legal constraints external to the parties' agreement forecloses the arbitration of those claims. Williams, 203 F.3d at 764 (*quoting* Mitsubishi Motors Corp., 473 U.S. at 628). As in any contract case, the parties' intent is controlling with regard to whether they agreed to arbitrate

10

a particular dispute, and determining intent is a question of law for the Court. See Armijo v. Prudential Ins. Co., 72 F. 3d 793, 797 (10th Cir. 1995) (citing Mitsubishi Motors Corp., 473 U. S. at 626). "'[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.'" Mitsubishi Motors Corp., 473 U.S. at 626 (quoting Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983)).

The Court concludes that Rayburn and BFRC have agreed to arbitrate the claims at issue here. Rayburn's two-count *Complaint* is brought pursuant to Title VII and alleges racial discrimination and retaliatory discharge. [Doc. 1 at 4]. The retaliatory-discharge claim stems from Rayburn's reporting of defective equipment to NMOSH, an exercise of his legally protected right to file workers' compensation claims and report safety violations. The EDR Plan as amended in 2003 specifically includes as arbitrable disputes claims of (1) race-based discrimination, including those arising under Title VII; (2) retaliation, including workers' compensation retaliation; and (3) involuntary termination. [See Doc. 7, Exh. 4 at 2]. Accordingly, the Court concludes that the claims raised in Rayburn's *Complaint* are among the specific types of claims the parties, by execution of the EDR Plan, have evinced an agreement to arbitrate.

Finally, aside from the challenges to the arbitration agreement's enforceability that are discussed above in Section II.A., Rayburn has pointed to no legal constraints external to the parties' agreement that would foreclose arbitration of his claims. See Williams, 203

F.3d at 764. Indeed, with limited exception, arbitration agreements arising in the context of employment relationships are upheld. See Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 109 (2001) (holding that § 1 of the FAA, which excludes from the Act's coverage contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce applies only to transportation workers). Moreover, the Tenth Circuit has specifically held arbitrable claims brought pursuant to Title VII. See, e.g., Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 39 F.3d 1482, 1487 (10th Cir. 1994) (*citing* Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20 (1991)). Accordingly, the Court concludes that the claims raised in Rayburn's *Complaint* come within the scope of the parties' arbitration agreement.

### C. Stay vs. Dismissal

Finally, BFRC asks this Court to dismiss Rayburn's *Complaint* or, in the alternative, stay the proceedings pending arbitration. [See Doc. 7 at 15-16]. Section 3 of the FAA provides, in pertinent part, as follows:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the Court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, *shall* on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . .

9 U.S.C. § 3 (emphasis added). As BFRC indicates, a number of circuit and district courts have held that, notwithstanding the mandatory language of § 3, dismissal is a proper remedy

12

when all of the issues presented are arbitrable. Choice Hotels Intern., Inc. v. BSR Tropicana Resort, Inc., 252 F.3d 707, 709-710 (4th Cir. 2001); see also, e.g., Alford v. Dean Witter Reynolds, Inc., 975 F.2d 1161, 1164 (5th Cir. 1992); Sparling v. Hoffman Const. Co., Inc., 864 F.2d 635, 638 (9th Cir.1988);  Sea-Land Serv., Inc. v. Sea-Land of P.R., Inc., 636 F.Supp. 750, 757 (D.P.R. 1986); Dancu v. Coopers & Lybrand, 778 F.Supp. 832, 835 (E.D.Pa.1991).

By contrast, the Third Circuit recently held that "the plain language of § 3 affords a district Court no discretion to dismiss a case where one of the parties applies for a stay pending arbitration." Lloyd v. Hovensa, LLC., 369 F.3d 263, 269 (3rd Cir. 2004).  It reasoned that, because the parties may seek the district Court's assistance during the course of arbitration, the district Court still has a significant role to play under the FAA even where it orders arbitration of all claims.  For example, § 5 of the FAA allows arbitrating parties to return to Court for resolution of disputes regarding the appointment of an arbitrator or the filling of an arbitrator vacancy.  Section 7 allows the parties to ask the Court to compel the attendance of witnesses, or to punish witnesses for contempt.  After an arbitration award is rendered, a party is entitled to seek relief in the district Court in the form of a judgment on the award or an order vacating or modifying it.  Id. at 270 (*citing* 9 U.S.C. §§ 9, 10, 11).  If the case were dismissed rather than stayed, the Third Circuit continued, the parties would have to file a new action each time assistance of the district Court was required, with the attendant risk of the case being assigned to a new judge.  "On the other hand, if the Court enters a stay of the action and retains jurisdiction, then proceedings under §§ 5, 7, 9, 10, or

11 may be expedited, as the parties may simply return the to the same district judge presiding over the . . . case." Id.

While the Tenth Circuit has affirmed dismissal of an action in favor of arbitration, Gibson v. Wal-Mart Stores Inc., 181 F.3d 1163, 1165 (10th Cir. 1999), it also has vacated a district Court's order of dismissal where the defendant had moved for a stay pending arbitration. Adair Bus Sales, Inc. v. Blue Bird Corp., 25 F.3d 953, 955 (10th Cir. 1994). In the instant case, the Court notes that, although BFRC seeks a stay of the proceedings as an alternative to dismissal, BFRC has nevertheless moved for a stay. [See Doc. 7 at 1, 15-16]. In such a situation, it appears that the better course is to stay the proceedings, rather than dismiss the *Complaint*. See id. (citing the mandatory language of 9 U.S.C. § 3 and noting that, because "Blue Bird did indeed move the district Court for a stay pending arbitration [, t]he proper course . . . would have been for the district Court to grant Defendant's motion and stay the action pending arbitration."). This language, plus the reasoning of the Third Circuit in Hovensa, persuade this Court that these proceedings should be stayed pending arbitration.

### III. CONCLUSION

For the foregoing reasons, the Court concludes that there exists in this case a valid and enforceable arbitration agreement. Additionally, the issues of race-based discrimination and retaliatory discharge raised in the *Complaint* are within the scope of that agreement. Finally, the Court determines that staying the proceedings pending arbitration, rather than dismissing the *Complaint*, is the proper course under the circumstances.

**IT IS, THEREFORE, ORDERED** that *Defendant's Motion to Compel Arbitration and Dismiss Plaintiff's Complaint or, in the Alternative, Stay the Proceedings* [Doc. 6] is GRANTED.

**IT IS FURTHER ORDERED** that the proceedings are STAYED pending arbitration.

**IT IS FURTHER ORDERED** that, in order to allow the Court to regulate and properly manage its docket, and to promote judicial efficiency, see Martinez v. IRS, 744 F.2d 71, 73 (10th Cir. 1984), counsel for plaintiff and counsel for Defendant shall provide the Court with a written status report every two (2) months, beginning March 1, 2006, therein advising the Court as to the progress of arbitration.

**SO ORDERED** this 29th day of December, 2005, in Albuquerque, New Mexico.

                                                 **M. CHRISTINA ARMIJO**
                                                 United States District Judge